UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 1:19-cr-10249-IT |
| | * | |
| JUSTIN WATSON, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

October 5, 2020

TALWANI, D.J.

Defendant Justin Watson is charged with making false statements during the purchase of firearms under 18 U.S.C. § 922(a)(6) and false statements in a record under 18 U.S.C. § 924(a)(1)(A). Indictment [#12]. He seeks an order suppressing the firearms and ammunition seized from his home on the ground that his consent to the search of his home was coerced. For the reasons that follow, Defendant's Motion to Suppress [#52] is DENIED.

I.   Factual Record[1]

   A.  Events Prior to the Interview

Defendant Justin Watson was an Institutional Security Officer III and Campus Police Dispatcher for the Cape Cod Community College Police from March 2018 to February 2019.

---

[1] The parties' dispute regarding the filing of supporting documentation in compliance with Local Rule 7.1(b), see Government's Opposition to Justin Watson's Motion to Suppress ("Govt's Opp'n") 1–2 [#68]; Defendant's Reply to Government's Opposition to His Motion to Suppress ("Def.'s Reply") 1–2 [#72], has been resolved by the subsequent filing of such documentation. See Response to Court Order by Justin Watson [#85]; Response to Court Order by USA [#86].

Following the hearing on this matter, Defendant submitted, and the court reviewed, the video of the January 28, 2019 interview submitted by the Defendant. See Mot. to Supplement Record for Mot. to Suppress [#89]; Elec. Order [#90].

1

Affidavit of Special Agent Brian P. Higgins in Support of Criminal Complaint ("Higgins Aff.") ¶ 3 [#1-1]. In this role, Watson neither carried a weapon nor possessed the power to make arrests. Id.

On July 18, 2018, Watson emailed an employee at Interstate Arms to inquire about purchasing a Glock pistol. Higgins Aff. ¶ 6 [#1-1].

On August 2, 2018, Watson was accepted to the Plymouth Police Academy's Basic Reserve Intermittent Program—a police reserve officer training program—as a member of the class whose training was to begin September 10, 2018. See id. at ¶ 5, ¶ 5 n.1; Transcript of First Interview with Justin Watson on January 28, 2019 ("First Jan. 28 Int.") 14, 68 [#86-1]. Acceptance to this program gave no promise of employment as a police officer. See Higgins Aff. ¶ 5 [#1-1]; First Jan. 28 Int. 68 [#86-1].

On August 13, 2018, an employee from Interstate Arms responded to his inquiry by asking him if he had "powers of arrest while off campus." Id. When Watson replied that he did not, the employee informed him that "to own a Glock in the state of Massachusetts, you have to have powers of arrest on and off duty." Id. Watson thanked the employee and wrote, "I will check with my friends over at Cape [Cod] Gun Works." Id.

Sometime later in August, Watson contacted a representative from Atlantic Tactical and ordered a Glock 22 pistol, saying he needed it for the police academy. First Jan. 28 Int. 16-17 [#86-1]. Atlantic Tactical transferred the order to Cape Cod Gun Works. Id. On August 26, 2018, a manager called Watson to tell him that the Glock had arrived and asked if he was a law enforcement officer. Higgins Aff. ¶ 7 [#1-1]. The government alleges that Watson replied that he

2

was a police officer.[2] Id. When Watson picked up the gun, he provided his Cape Cod Community College identification card, which stated that he was "CAMPUS POLICE" and "FACULTY/STAFF." Id. at ¶ 8. He also filled out a Public Safety Purchase Form identifying himself as an "Institutional Security Officer (ISO) III." Id.

On November 17, 2018, Watson, accompanied by his girlfriend, Defendant Angel Ecker, went to Bourne Bridge Guns and Ammo. Id. at ¶ 10. Watson had called ahead and been informed by the store's operator that only law enforcement officers with the power to make arrests could purchase Glock Model 26 firearms, to which Watson allegedly replied he was a police officer with arrest authority. Id. at ¶ 9. At the store, Watson again allegedly identified himself as a police officer, and Ecker told the sales manager that she was Watson's boss and that Watson had the power to make arrests.[3] Id. at ¶ 10. Watson purchased a Glock 26 pistol and completed the required ATF Form 4473. Id. at ¶ 11. In response to the question: "Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person," Watson answered, "Yes." Id. Despite residing in Mashpee, Massachusetts, he completed the form using an address in Yarmouthport, Massachusetts. Id. at ¶ 4, 11, 15. A few weeks later, on December 19, 2018, Watson transferred legal ownership of the Glock 26 pistol purchased from Bourne Bridge Guns and Ammo to Ecker. Id. at ¶ 13.

---

[2] Watson denied identifying himself as a police officer at any point during any of the transactions to purchase the Glock pistols throughout his interview with ATF Agents Higgins and Kefalas. See First Jan. 28 Int. 27, 54, 77 [#86-1].

[3] In his interview with ATF Agents Higgins and Kefalas, Watson disputes that he or Ecker ever stated that Ecker was his boss with the intent to deceive the store manager. First Jan. 28 Int. 58–59 [#86-1]. During the interview, Watson stated that he did not remember saying Ecker was his boss, clarifying, "I might've been jokin' around with [the store manager], like, 'Well, she's the boss.' Like, 'She rules the roost.' You know what I mean?" Id. at 59.

As of January 28, 2019 (two days prior to the program completion date), Watson had not secured a job as a police officer. See Higgins Aff. ¶ 5 [#1-1]; First Jan. 28 Int. 68 [#86-1].

B. Defendant Watson's Interview with ATF Agents

On January 28, 2019, ATF Special Agents Brian Higgins and Christopher Kefalas approached Watson at Cape Cod Community College, told him that they wanted to speak with him about an ongoing investigation, and suggested that he go with them to the Barnstable Police Department. ATF Report of Investigation ("ATF Report") ¶ 1 [#85-1]. They advised him that the conversation was voluntary and that he was not being taken into custody. Id. Watson agreed, and the Agents drove him to the police station. Id. at ¶ 1–2.

Once there, Agent Higgins reminded Watson that he was not in custody, told him that he was "not gonna be arrested today," and then read him a Miranda waiver, which Watson subsequently signed. First Jan. 28 Int. 7-9 [#86-1]. During the interview that followed, Watson admitted to purchasing the Glock 26 pistol for Ecker because he knew that she could not purchase it herself, and confirmed that he had never had any intention of keeping it for himself. Id. at 46–50. He admitted that he misrepresented himself as a police officer by using his Cape Cod Community College identification card that said he was "Campus Police." Id. at 55–56. He confirmed that he knew the sales manager needed to believe he was a police officer in order for him to gain possession of the Glock. Id. at 56; see also id. at 70.

After Agent Higgins explained to Watson that he believed he had committed two federal crimes, the agent asked "[s]o now how do we move forward? What do we do?" Id. at 74. Watson responded, "[w]ell, I think a, a, a start would be, uh, to give you guys the guns." Id. at 74. The exchange continued:

> HIGGINS: Well, let me tell you what's gonna happen. Dennis is gonna take your, your, your license to carry.

4

>WATSON: Mm-hmm.
>
>HIGGINS: I've already spoken to the Chief in Dennis. I've spoken to the Chief in Mashpee. When we leave here, we're gonna have to go down to Mashpee, and we're gonna have to s-- grab up those guns that you have. Okay? And then we'll sort it out and figure out where we go from here. But I would hope that I would have your continued cooperation so that we can bring this to a logical conclusion.
>
>WATSON: Mm-hmm. Do you know –
>
>HIGGINS: Look it, look it. Look it. You made a dumb mistake. That's what it is. I can't -- I'm not gonna sugarcoat it.
>
>WATSON: Mm-hmm.
>
>HIGGINS: You made a dumb mistake, all right? But I admire ya for tellin' the truth, because if you didn't tell the truth it would've looked even worse than it is. It looks bad. Do ya think it looks bad?
>
>WATSON: It looks bad. It looks bad. But I guess my biggest question is how do we fix it. And, like you said, uh –
>
>HIGGINS: Well, we keep open lines of communication. We start off by the Dennis guys, we're gonna have to grab your LTC, okay? Can't buy any more guns.

Id. at 74–75.

Shortly thereafter, Agent Higgins asked Watson "would you give consent for me to search that phone to know you're tellin' the truth?" Watson replied, "sure." Id. at 87. After giving the agents his password, Watson said, "[t]here's no point in saying no to you. You'll just get the warrant," and then clarified, "there's no point in sayin' no 'cause I'm not gonna make you go through the trouble of getting a warrant." Id. at 89.

After collecting the phone, Higgins and Watson had the following exchange:

>HIGGINS: Do you feel better you told the truth?
>
>WATSON: I, I do... I, I... The –

HIGGINS: It's just embarrassing, right?

WATSON: Yeah.

HIGGINS: All right, let me tell you how things are gonna go right now. I'm gonna bring the detectives in from, uh, Dennis Police Department, for the purposes -- they're going to pr-- give you a letter, seizing your LTC.

WATSON: Mm-hmm.

HIGGINS: I'm gonna give you a ride back to the college.

WATSON: Mm-hmm.

HIGGINS: We're gonna -- we're gonna secure your car, okay? Um, you can get that ID out for Dennis PD –

WATSON: Mm-hmm.

HIGGINS: And then we're gonna proceed over to the house in Mashpee, and we'd like to get the firearms.

WATSON: Okay.

HIGGINS: Okay?

WATSON: Yep.

HIGGINS: And, uh, I-I'm in touch with people from Mashpee, so we're gonna make that happen, okay?

WATSON: Okay.

HIGGINS: And, uh, with the exception of the two Glocks, I'm gonna have, uh, Mashpee take all the firearms for safe keeping.

WATSON: Okay.

HIGGINS: Okay? Do you have any questions for us? Anything else you want to know? Look, if I can answer it, I will.

Id. at 92-93. At the end of the interview, Detective Matthew Turner of the Dennis Police Department gave Watson a letter informing him that his license to carry was being suspended.[4] Id. at 96; ATF Report ¶ 26 [#85-1A].

      C. <u>Entry into Watson's Home and Seizure of Evidence</u>

Agents transported Watson to Cape Cod Community College, where his car was parked. ATF Report ¶ 28 [#85-1A]. Watson then drove, with ATF agents following, to his residence in Mashpee, Massachusetts so that the agents could seize his firearms. Id.

Neither party has provided any evidence of what occurred between the arrival at Watson's residence with ATF agents in tow and the agents' seizure of the weapons. The government asserts, without support, that Watson led agents to the door of his residence, unlocked his door, led them to a room with a locked safe, unlocked the safe, and turned over the firearms to the agents. See Government's Opposition to Justin Watson's Motion to Suppress ("Govt's Opp'n") 5 [#68].[5]

Altogether, the agents collected a Glock 22, a Glock 26, ten rounds of .9mm ammunition, and four Glock 22 fifteen round magazines as evidence, and, "with Watson's consent," secured his Aero Precision Inc. "for safekeeping." ATF Report ¶ 29–30 [#85-1]; Mashpee Police Department Personal Narrative for Detective Brett Calhoun (MPD Report) ¶1–2 [#85-1]. The

---

[4] Watson voluntarily submitted to a second interview that same day. It is not clear from the transcript exactly what time it occurred, but at the August 11, 2020 hearing, parties clarified that it occurred prior to the search and seizure. There was, however, no conversation during that interview relevant to this motion. See Transcript of Second Interview with Justin Watson on January 28, 2019 [#86-1].

[5] Defendant's statements in his first interview with Agent Higgins do provide some factual support for the contention that his firearms were locked in a safe at his residence at the time of the disputed entry and seizure. See First Jan. 28 Int. 25 [#86-1].

7

Mashpee Police Department arrived at the residence and secured Watson's remaining firearms and ammunition "for safekeeping." ATF Report ¶ 31 [#85-1]; MPD Report ¶1–2 [#85-1].

II.     Analysis

Defendant contends that the guns and ammunition seized by ATF Agents and Mashpee Police Officers should be excluded from evidence because they are the "fruits of an unlawful entry and seizure performed . . . without valid consent, probable cause or a warrant." Motion to Suppress 1 [#52]. The government argues that the entry and search were valid under the consent exception to the Fourth Amendment's warrant requirement.[6] Govt's Opp'n 2–4 [#68].

Searches conducted without a warrant are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). If a warrantless search does not fall within an exception, evidence seized during that search may not be used against the defendant, Wong Sun v. United States, 371 U.S. 471, 488 (1963), and instead is suppressed "to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236-37 (2011). "To secure the admission of evidence obtained without a warrant, the government must show that the warrantless search fell within one of a handful of narrowly defined exceptions." United States v. Almonte-Báez, 857 F.3d 27, 31 (1st Cir. 2017).

One such exception is a search conducted pursuant to the valid consent of an appropriate party. U.S. v. Romain, 393 F.3d 63, 68-69 (1st Cir. 2004); see also Schneckloth v. Bustamonte,

---

[6] The government also argues that the firearms seized from Defendant's residence on January 28, 2019, are relevant, admissible evidence during Defendant's trial. Govt's Opp'n 9 [#68]. In his Motion to Suppress [#52], Defendant makes no argument to the contrary.

412 U.S. 218, 222 (1973). To be valid, consent must be "freely and voluntarily given," United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)), that is, it must be "the product of an essentially free and unconstrained choice." United States v. Dion, 859 F.3d 114, 129–30 (1st Cir. 2017) (internal quotation omitted). Consent "need not be express but may be fairly inferred from context." Birchfield v. North Dakota, 136 S.Ct. 2160, 2185 (2016). However, it must be "more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968). In evaluating the validity of purported consent, the court looks at the totality of the circumstances surrounding the search, including, but not limited to: (1) the consenter's age, education, past experiences, and knowledge of the right to withhold consent;[7] (2) whether the consenter was advised of his constitutional rights; and (3) whether the consent was obtained through coercive tactics or circumstances. See United States v. Vanvliet, 542 F.3d 259, 264 n.2 (1st Cir. 2008).

Here, where parties agree that agents entered Defendant Watson's home without a warrant, the government bears the burden of proving by a preponderance of the evidence that the defendant validly consented to law enforcement's search. See United States v. Rodríguez-Pacheco, 948 F.3d 1, 6 (1st Cir. 2020).

    A. <u>Explicit Consent to the Seizure</u>

The government contends that Defendant expressly consented to the seizure of the guns when, in response to Agent Higgins' question about how to "move forward," he answered "Well, I think a start would be to give you guys the guns." Gov't Opp'n 3 [#68]; see First Jan. 28 Int. 74

---

[7] There is by no means a requirement "that the person who gave consent must have been explicitly advised of the right to withhold it." United States v. Pérez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000) (citing Schneckloth, 412 U.S. at 234).

[#86-1]. Defendant concedes that he consented to the seizure, arguing instead that "a consent for a particular purpose (to turn over guns) is not an invitation to enter a home." Def.'s Reply 2 [#72].[8] Thus, while the court agrees with the government that, considering the totality of the circumstances, Defendant's comment is properly construed as explicit consent to the seizure of his guns, Defendant's point that this was not an explicit consent to enter his home is well-taken.[9] There was no conversation, or at least, no evidence submitted to this court of a conversation, about the manner by which the guns would be retrieved in order to turn them over to law enforcement.[10] Thus, the court moves on to determine whether the Defendant's valid consent to

---

[8] Although Defendant explicitly contends that the "entry and seizure" were unlawful, Motion to Suppress 1 [#52], his argument throughout the Motion [#52] and Reply [#72] focuses on the unlawfulness of the entry into the home. See Motion to Suppress 5 [#52] ("Here, the language used by the agent was that of presumption and authority…Nothing about, say, when we get to your house, are you going to let us in? Or, do you mind signing this consent to search form? The evident premise was that the Dennis Police Officers are 'going to give you a letter seizing your LTC', with officers then authorized to seize the firearms. One notes that the governing Massachusetts statute, MGL c. 140, § 129D, offers no such power of entry into a home…"); Reply 3 [#72] ("why, when the interviewer made an effort to obtain defendant's consent both orally and in writing to search his cell phone, he made no comparable effort (or more flatly, any effort) to secure defendant's consent to enter the residence?").

[9] Indeed, the First Circuit's recent analysis in United States v. Gabriel Rodríguez-Pacheco makes very clear the distinction between consent to the seizure of a gun located inside a home and consent to enter that home. 948 F.3d 1 (1st Cir. January 15, 2020). In that case, the defendant, who had met the arresting officers in front of his home, offered to go retrieve the weapon from his bedroom. The arresting officer describes the following exchange:

> Immediately I told him, "No, I'll go with you. You tell me where the weapon is and I'll seek it." To which he answered me, "Okay, no problem." He made a gesture with his hand and said, "follow me."

Id. at 4. The court remanded for a determination as to whether entry in the home was justified by the defendant's consent. Id. at 10.

[10] The closest Agent Higgins came during the interview to seeking explicit consent to enter Watson's home was in the following exchange:

> HIGGINS: And then we're gonna proceed over to the house in Mashpee, and we'd like to get the firearms.
>
> WATSON: Okay.

the agents' warrantless entry into his home can be properly inferred from the totality of the circumstances.

### B. Inferred Consent to Search of the Home

The government contends that Defendant's consent to enter his home was "inferable from his actions" because he was "cooperative throughout his interactions with ATF," "displayed familiarity with the law," and "facilitate[d] the seizure" of the weapons from his home. Govt's Opp'n 4-5 [#68] (citing Birchfield, 136 S. Ct. at 2185). Defendant argues that his actions were merely acquiescence to the agents' claim of lawful authority. Motion to Suppress 5 [#52] ("Here, the language used by the agent was that of presumption and authority"). Neither party has provided the court with an account of the entry and search of the home itself. Defendant contends that it is clear from the interview that any consent, such as it may have been, was mere acquiescence to authority. See Motion to Suppress 5 [#52]. The government, in turn, contends that the appropriate inference from the interview and the circumstances surrounding the entry is that, in accordance with his cooperative manner throughout his interactions with agents on January 28, 2019, Defendant validly consented to their entry into his home in order to effectuate the seizure to which he explicitly consented. Govt's Opp'n 4-8 [#68]. The First Circuit recently affirmed, in a case addressing warrantless entry into a home, that consent is "a jealously and carefully drawn exception to the warrant requirement," Pagán-González v. Moreno, 919 F.3d 582, 591 (1st Cir. 2019) (quoting Georgia v. Randolph, 547 U.S. 103, 109 (2006)), but it has also

---

        HIGGINS: Okay?
        WATSON: Yep.

First Jan. 28 Int. 92-93 [#86-1]. He does not, however, sufficiently clarify the manner by which he would "get" the weapons to render Watson's assent explicit consent to the entry of his home.

long recognized that "the pressure exerted on a criminal by the realization that the jig is up is far different from the deliberate or ignorant violation of personal right that renders apparent consent ineffective." Gorman v. United States, 380 F.2d 158, 165 (1st Cir. 1967).

In U.S. v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996), the defendant argued that a resident's consent to search her apartment was not valid because, although she signed a consent form, she did not speak English well enough to understand it, and, thus, her consent was invalid and the search was unconstitutional. The court found that, where the defendant "filed no affidavits in support of the motion, not even from [the resident of the apartment], on whose state of mind he [] so heavily relie[d]" while "the prosecution, in opposing the motion, provided copies of the police reports which told a different story" there was no reason to overturn the district court's determination[11] that consent had been validly given. Id.

Here, at the time of the search and seizure, Defendant was an adult who had completed all but two days of a police reserve training academy, and who had voluntarily submitted to a non-custodial interview at which he was nevertheless Mirandized. Over the course of that interview, it was made clear to him that ATF had substantial information about his allegedly unlawful purchase of two Glock pistols and believed he had committed two federal crimes. Defendant acknowledged that "[i]t look[ed] bad" and said his "biggest question is how do we fix it." First Jan. 28 Int. 75 [#86-1]. Agent Higgins responded, "Well, we keep open lines of communication."[12] Id. That is, he asked for Defendant's cooperation.

---

[11] The district court wrote: "Defendant vaguely claims that [the resident's] consent was coerced or was otherwise ineffective, but he offers no affidavit or statement from [the resident] to that effect, describes no circumstances supporting his assertion, and makes no offer of proof relative to any other facts that might support his assertion." U.S. v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996).

[12] Agent Higgins continued to say: "We start off by the Dennis guys, we're gonna have to grab

When Agent Higgins subsequently sought consent to search Defendant's phone, Defendant replied, "sure," and then added "[t]here's no point in saying no to you. You'll just get the warrant…there's no point in sayin' no 'cause I'm not gonna make you go through the trouble of getting a warrant." First Jan. 28 Int. 89 [#86-1]. Defendant, thus, demonstrated a knowledge of his constitutional rights and an interest in nevertheless cooperating with the authorities.

Shortly thereafter, Agent Higgins laid out a plan for Defendant, describing "how things are gonna go right now" beginning with the confiscation of Defendant's LTC and a drive back to the college to pick up Defendant's car. Id. at 92. Agent Higgins continued, "[a]nd then we're gonna proceed over to the house in Mashpee, and we'd like to get the firearms." Id. at 93. Although Agent Higgins did use a significant amount of imperious language, he did not claim the authority to enter Defendant's house and seize the firearms. Instead, he expressed an interest in doing so, and Defendant, who had already demonstrated a desire to cooperate, responded, "Okay." Id. Agent Higgins then confirmed, "Okay?" and Defendant replied, "Yep."[13] Id. Defendant then drove with the agents to get his car, and drove home with the agents following. ATF Report ¶ 28 [#85-1]. The agents subsequently entered his home and seized a variety of weapons and ammunition. Id. at ¶ 29-31.

---

your LTC, okay? Can't buy any more guns." First Jan. 28 Int. 75 [#86-1]. He made a similar statement later in the interview: "I'm gonna bring the detectives in from, uh, Dennis Police Department, for the purposes -- they're going to pr-- give you a letter, seizing your LTC." First Jan. 28 Int. 92 [#86-1]. Defendant argues that, in this second statement, "[t]he evident premise was that the Dennis Police Officers are…then authorized to seize the firearms." Motion to Suppress 5 [#52]. The court notes that, in the earlier statement, Higgins identifies the consequence of confiscating the license to carry as being an inability to further purchase firearms.

[13] Because the government does not argue that this constitutes explicit consent to enter Defendant's home, the court does not consider the exchange in isolation. It is sufficient that this conversation, combined with Defendant's actions, viewed in light of the totality of the circumstances, indicates that Defendant's consent was valid.

As the First Circuit has noted, "[b]owing to events, even if one is not happy about them, is not the same thing as being coerced." Robbins v. MacKenzie, 364 F.2d 45, 50 (1st Cir. 1966), cert. denied, 385 U.S. 913 (1966). The court disagrees with Defendant's interpretation of the first January 28, 2019, interview. Defendant's acquiescence to Agent Higgins' plan does not appear to be the result of a false claim of lawful authority by the agent. Cf. Bumper v. North Carolina, 391 U.S. 543, 548-549 (1968) (The burden of demonstrating the defendant's consent was valid "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"). Rather, as he repeatedly expressed, Defendant hoped to ameliorate the damage caused by his allegedly unlawful acts through cooperation with law enforcement. He intended to facilitate the seizure because he was "bowing to events." Here, as in Calderon, Defendant has provided no evidence of his own state of mind that contradicts that conclusion.

Thus, taking into account the totality of the circumstances, including Defendant's age, education, expressed interest in cooperating, knowledge of his constitutional rights, and experience with law enforcement procedure, as well as the fact that he was not in custody but had been read his Miranda rights, the court finds that the government has demonstrated by a preponderance of the evidence that Defendant's consent both to the seizure of his weapons and the preceding entry into his home was valid.

III. Conclusion

Accordingly, Defendant Watson's Motion to Suppress [#52] is DENIED.

IT IS SO ORDERED.

Date: October 5, 2020                                    /s/ Indira Talwani
                                                         United States District Judge