UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )     DOCKET NO.: 19-CR-10249-IT |
| v. | ) |
| | ) |
| JUSTIN WATSON | ) |
| | ) |

## **DEFENDANT'S SENTENCING MEMORANDUM**

Justin Watson stands before this Honorable Court to be sentenced after pleading guilty to one count of false statements during a purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6), and one count of false statement in a record, in violation of 18 U.S.C. § 924(a)(1)(A).[1] His offenses occurred in November 2018 when – while enrolled at a municipal police academy and working for campus police at a community college – he reported to a licensed firearms dealer both that he was a police officer and the actual buyer of a Glock firearm, and he listed an old home address on the purchase form. In January 2019, when Justin was interviewed by agents – months before he was charged – the agents acknowledged that he told them the truth and commended him for "owning up to it."[2] Since his initial appearance on this case more than three years ago, Justin has faced the personal and professional consequences of his conduct: losing his job, his hopes for a career in law enforcement, and his standing in the community. But the last three years have also demonstrated both the seriousness with which he takes this case and his amenability to rehabilitation, as he has fully complied with all conditions of release and consistently reported to U.S. Pretrial Services.

We submit that <u>a time-served sentence with one year of supervised release</u> is an appropriate disposition in this case and is "minimally sufficient to achieve the broad goals of sentencing." *United*

---

[1] *See* Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(1)(B), at D.E. # 127.
[2] *See* Transcript of Justin's interview with agents on January 28, 2019 ("Transcript"), at D.E. # 86-2, pg. 13 (WATSON_00000650); *see also* PSR ¶¶ 17-18.

*States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). We also submit that conditions of supervised release to include community service would best serve the sentencing goals of rehabilitation, deterrence, and just punishment. Although we submit that the 3553(a) factors support a sentence that focuses on rehabilitation as the primary sentencing goal and considers Justin's demonstrated capacity for community-based rehabilitation, the proposed sentence also considers the nature and seriousness of the offenses, his personal history, and the sufficiency of a supervised release term to serve any deterrent effect.

## BACKGROUND AND HISTORY OF JUSTIN WATSON[3]

For nearly his entire life, Justin Freeman Watson has had one dream: to become a police officer. Everything he did leading up to his offenses in this case was geared towards achieving that goal – first working as a call firefighter and EMT for a local fire department on Cape Cod, then as an officer and field service manager in the private security field, later enlisting in officer training with the Massachusetts Trial Court, and ultimately enrolling in the police academy with the sponsorship of his then-employer. Justin knows and understands that his conduct in this case not only diminished his lifetime of service but extinguished the hopes that motivated his entire professional career. While neither justification nor excuse, the information that follows is offered to help shape a just sentence.

*Early Life*

Justin Watson learned early on who he wanted to be in life – but also, who he did *not* want to be. He grew up with his mother, Diane, his father, Freeman, and his two younger sisters on Cape Cod. PSR ¶ 44. But unlike the idyllic, oceanside experience of summer vacationers on the Cape, Justin's childhood was "tumultuous" and fraught with conflict. *Id.* Freeman struggled to maintain steady work, and as a result, the family moved around a lot and at one point lived at the Holiday Inn in

---

[3] The descriptions herein are drawn from the Presentence Report, letters of support, discovery materials, and counsel's own research, cited respectively.

Provincetown for 2-3 months. *Id.* His parents fought often, with his father instigating most fights and, at least once, physically abusing his mother. *Id.* Justin remembers, with shame over his father's behavior, that police responded to their home to break up the fight. *Id.* When he was 14-15 years old, shortly before his parents divorced, Freeman punched Justin in the face, knocking him out. *Id.*

His childhood effectively ended prematurely when, at just 14-15 years old, Justin got his first job. Without regret, Justin "step[ped] up and help with the household expenses," to ensure that his mother was able to "gain her independence from his father." PSR ¶ 45; *see also* Exhibit D, Letter of Diane Hollon. His mom received some public benefits, but Justin supplemented the household income by first washing dishes at a local restaurant for a summer, and later working at Nickerson Service Center for eight years, during and after high school. Nearly all of Justin's paychecks went towards the family's rent, groceries, utilities, and gas for his mom's car. He also helped his mom raise his sisters, who were just 10 years old and 1 year old when Justin got his first job at 15. *Id.* at ¶¶ 48-49.

These difficult experiences in his youth, and his father's terrible example, served as significant motivating factors for Justin. When he was interviewed by agents in this case, Justin described his father as "the worst kind of person you could possibly be," and juxtaposed what he wished for himself – a good, law-abiding life with a steady and stable career – with the path taken by his father, what he referred to as "a whole lifetime of stupid s---."[4] The example that Justin instead chose to model himself after was that of his boss at Nickerson's, Cary Hollon. PSR ¶ 45. Cary, Justin's boss at Nickerson, took Justin under his wing and taught him the ins and outs of mechanics and how to be a responsible worker. *Id.* Cary was such a positive example to Justin that when Diane once stopped by the shop to get gas money from Justin, Justin introduced her to Cary. *Id.* Diane and Cary eventually married, and Cary became a tremendous stepfather to Justin and his sisters. They were very close

---

[4] *See* Transcript, at D.E. # 86-2, pg. 3 (WATSON_00000641).

until Cary sadly passed away in 2016. *Id.*

*Employment History*

Justin's adolescence and adulthood stands in stark contrast to his father, and is remarkable for his continued, steady employment. While working for the better part of a decade at Nickerson's, Justin attended the Barnstable County Fire and Rescue Training Academy and worked at the Brewster Fire Department for two years, first as a volunteer firefighter and then part-time as a junior firefighter. *Id.* at ¶ 71. For the next 10 years, he worked for Securitas as a security officer and a field service manager. *Id.* at ¶ 70. In his role as field service manager, Justin supervised 135 employees and was in charge of guarding operations, and managed accounts across different markets (healthcare, hospitality, retail, and housing). Motivated to achieve a career in public service, he first enlisted in court officer training with the Massachusetts Trial Court, and later began work as an Institutional Security Officer and Campus Police Dispatcher at Cape Cod Community College. *Id.* at ¶¶ 767, 69.

*Circumstances and Nature of the Offenses*

Prior to his conduct and actions in this case, Justin Watson had never been in any kind of legal trouble – he had never been summonsed, arrested, charged with, or convicted of any crime. To say that he regrets his choices here would be an understatement. Though by no means offered as an excuse or justification, the context and nature of the offenses here are important for the court to consider.

The restrictions on Glock sales in Massachusetts is governed by Massachusetts state law – specifically the Attorney General's handgun regulations and state consumer protection laws.[5] The regulation on Glocks specifically prohibits firearms dealers from selling Glock handguns to Massachusetts consumers because of an issue related to the "load indicator" on the handgun (which

---

[5] *See* "Enforcement Notice: Attorney General's Handgun Safety Regulations," and "July 16, 2004 Consumer Advisory on Glock Handguns," available at: https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download.

indicates whether there is a projectile in the chamber).[6] However, this regulation does not pertain to "firearms used by law enforcement or military personnel as part of their official duties."[7] Justin's actions did not violate these state regulations because the regulations restrict only the actions of the firearm dealers, not the consumers. The offenses charged here stem instead from the false statements Justin made in purchasing the Glock firearm.

There is no allegation or evidence whatsoever that Justin was somehow careless with his firearms or that he endangered any member of the public through his possession and/or use of firearms. Nor did Justin attempt to obtain the Glock firearm through the "frame game," where buyers purchase stripped Glock parts in pieces to avoid triggering the regulation's prohibition on sales of Glock handguns.[8] Though he admitted that he claimed to have arrest powers and was a police officer, Justin did not create or submit any falsified credentials or identification, and provided his genuine campus police identification card, and identified himself correctly as an Institutional Security Officer on the Public Safety Purchase Form.[9] He registered the firearm, and later transferred it to his then-girlfriend, Angel, and made no attempts to hide the purchase or transfer. Both he and Angel also had valid licenses to carry a firearm,[10] and Justin lawfully possessed and safely stored other firearms.

Of course, what Justin did in this case has endangered that which he holds most dear – his ability to dedicate his professional career to a life of public service. As a convicted felon, he will be barred from owning and possessing firearms – indeed, all of his firearms were seized by agents. When he was interviewed by agents in January 2019, he told them: "I'm pretty sure it's gone now but … I

---

[6] *See id.*
[7] *See id.*
[8] *See e.g.* Forum and Comments re: Glock Frames, available at: https://www.ar15.com/forums/Handguns/Bought-OEM-stripped-Glock-frames-and-got-visit-from-ATF/13-202586/.
[9] *See* D.E. # 12, Indictment at ¶ 10; PSR at ¶ 19.
[10] *See* D.E. # 12, Indictment at ¶ 3.

did want to be a police officer, I did want to do good."[11] The terrible truth is that had Justin just waited and completed police academy, a firearms dealers would have been permitted to sell Justin a Glock firearm for himself as the regulation explicitly exempts law enforcement or military personnel and permits them to obtain Glocks as part of their official duties.[12] Likewise, regardless of whether Justin had finished academy, a lawful owner of a Glock or a pre-ban firearm could have transferred the firearm to Justin, or to Angel, and that would not have violated the AG's regulations. But, admitting that he "got ahead of [him]self", Justin made the terrible decision to engage in this offense.

As a result of his conduct, before he was formally charged, Justin lost his job with the campus police. PSR ¶ 67. The CCCC Police Department also withdrew their sponsorship of his position in the municipal police academy, and he was discharged. *Id.* at ¶ 66. Justin struggled to find work to which he was well suited, given his training and strengths, and deeply humbled, he returned to his mechanic roots and worked as a mechanic and tow truck driver for a towing company on the Cape. *Id.* at ¶ 65. He now works multiple jobs, as a security officer and as a truck driver for a produce company on Cape Cod. *Id.* at ¶¶ 63-64.

*A Path Forward: Acceptance, Humility, and Hopes for the Future*

Less than a month after Justin learned he was under investigation in this case and after he had been interviewed multiple times by agents, he learned that his father had killed himself in a hotel room in New Mexico. *Id.* at ¶ 50. Though this was deeply painful for Justin and his sisters, Justin renewed his commitment to leading a life of purpose. Deeply humbled by the dramatic change in his circumstances and remorseful for his crime, Justin is intensely motivated to rehabilitate himself, not just in the eyes of his family, friends, employers, and the community, but in his own mind as well.

To that end, Justin has thrown himself into several different jobs, with an unrivaled and

---

[11] *See* Transcript, at D.E. # 86-2, pg. 13 (WATSON_00000650).
[12] *Id.* at pg. 2. *See also* Note 5, *supra*.

positive work ethic. His current boss, Sean Maher, shared his belief that Justin is an "exceptional employee and person who is always willing to learn and excel at his job," and explained that Justin's good work is consistent and beneficial for his other employees. *See* Exhibit B, Letter of Sean Maher. Justin's consistently positive work ethic is not a recent development and can be seen in prior jobs as well. While working at Securitas in 2013, he was singled out for his work at the Institute of Contemporary Art's Cliff Diving World Championship, and received excellent praise for his "outstanding [] work performance" and his "consistent and admirable efforts to deliver quality service to [Securitas'] clients." *See* Exhibit C, Letter of John Fratolillo, Jr.

In a significant demonstration of acceptance and rehabilitation, Justin pleaded guilty and took responsibility for the offenses. His plea agreement also allowed for Angel, his co-defendant, to be considered for pretrial diversion, a disposition this Honorable Court ultimately adopted.[13] Though their romantic relationship did not survive this case, they remain on good terms. PSR ¶ 55.

As further evidence of his dedication and amenability to rehabilitation, Justin has a perfect record of compliance with pretrial release conditions. *See* Exhibit A, Release Status Letter. His release conditions included requirements that he: continue employment, or actively seek employment; surrender any passport and not obtain a new one; not possess a firearm or destructive device; maintain his residence and do not move without prior permission; execute an unsecured $10K bond; and restrict his travel to certain states. *Id.*[14] He is committed to maintaining that same unblemished record of compliance on supervised release.

---

[13] *See* D.E. # 148, Order Approving Deferral of Prosecution as to Angel Ecker.
[14] *See also* D.E. # 8, Order Setting Conditions of Release, and D.E. # 9, Appearance Bond. Although the PSR, at ¶ 55, indicates that Justin had not reported a change of address to U.S. Probation and Pretrial Services as of 7/1/22, undersigned counsel confirmed with Probation that he has since reported the change of address and is in full compliance with his conditions of release.

7

## ARGUMENT

### A SENTENCE OF TIME SERVED IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO EFFECTUATE THE SENTENCING GOALS OF 18 U.S.C. § 3553(a).

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Sentencing requires a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and that, at least in the federal context, the federal statutory factors to be considered are "a tapestry of factors, through which runs the thread of an overarching principle [of parsimony]." *Rodriguez,* 527 F.3d at 228, citing *Kimbrough v. United States,* 562 U.S. 85, 101 (2007). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *Id.*

Here, both the statutory and guideline provisions permit a non-jail sentence of probation pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G. §§ 5B1.1(a)(2) and 5B1.2(a)(1). For the reasons that follow, a community-based, non-jail sentence is sufficient but not more than necessary to achieve the goals of sentencing.

<u>Sentencing Guidelines</u>

While courts must *consider* the sentencing guidelines, the Supreme Court has held that the Court may not presume that the guideline sentencing range is reasonable, and Congress has *required* federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough*, supra; *Gall v. United States*, 552 U.S. 38 (2007). Here, the parties agree with Probation's calculation of the guidelines, as also expressed in the

8

Plea Agreement. With zero criminal history points and criminal history category I, the resulting advisory guideline sentencing range for a total offense level 10 is 6-12 months imprisonment, with 1-3 years of supervised release. PSR ¶ 34, pg. 18.

Falling within Zone B of the Sentencing Table, the guidelines permit a term of probation to be imposed if a condition, or combination of conditions, is imposed that requires a period of community confinement, home detention, or intermittent confinement sufficient to satisfy the minimum term of imprisonment (here, 6 months). *See* U.S.S.G. § 5B1.1(a)(2) and Application Note 1(B). That proposed sentence structure is, as with all mandates and recommendations of the guidelines, is advisory. Here, where neither a term of imprisonment nor a term of confinement is necessary to deter Justin from further criminal activity, and where he has evinced an amenability and commitment to rehabilitation, a non-jail, community-based sentence is warranted. Finally, where his rehabilitation is best achieved and maintained through employment and community supports, incarceration and/or confinement even at the low end of the applicable guideline range is not necessary or likely to satisfy that important goal of sentencing.

<u>First-Time Offender</u>

Where society's interest in and need for retribution, deterrence, and protection are concerned, offenders like Justin Watson – with no prior criminal records or history of violence and a history of service to the community – represent a special case and warrant a downward variance. Having never before been charged, arrested, or convicted of any crime, Justin falls under the Sentencing Commission's "Group A" offender category, and thus has the lowest primary recidivism rate.[15] Generally, the Guidelines should "reflect the general appropriateness of imposing a sentence other

---

[15] U.S.S.C., "Recidivism and the "First Offender,'" at 4-5 and 14 (noting Group A's recidivism rate as 6.8 percent) (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.

than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Without at all minimizing Justin's offense conduct, there is no indication that an offense like Justin's – although it involved a firearm –

For truly first-time offenders like Justin, rehabilitation should be the primary focus of the sentenced imposed here, and a one-year term of supervised release would fulfill that important goal. A community-based sentence would allow Justin to continue productively working and continue the fully compliant path he set out on the day of his initial appearance in this case. A term of supervised release to include a condition that he perform community service would also restore Justin's dedication to public service and enable him to right his wrongs in a meaningful way.

Avoiding Unwarranted Sentencing Disparities

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). The U.S. Sentencing Commission provides some limited data of dispositions for defendants whose primary guideline was U.S.S.G. § 2K2.1: in the last five fiscal years (2017-2021), 271 offenders with Justin's same criminal history category (I) and offense level (10) were sentenced in federal court.[16] Both the average and median sentence imposed was 6 months, which is at the low end of the applicable advisory guideline sentencing range.[17] This data does considers neither the defendants' background nor other mitigating factors, and the data relating to average and/or median length of imprisonment does not include those cases where defendants were sentenced to terms of probation or a fine,

---

[16] *See* U.S. Sentencing Com'n, Judiciary Sentencing Information data for Primary Guideline § 2K1.2 at cell I, 10, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.
[17] *Id.*

10

potentially and significantly skewing the results.[18] As a result, it may be difficult for the Court to draw easy comparisons between those cases and this one.

But more importantly, and more helpful to the court's analysis of the usefulness of this data: of the 271 offenders sentenced within Justin's CHC and total offense level, less than half (119 offenders, 44 percent) received a sentence of imprisonment, in whole or in part, while 56 percent of offenders within this same category were sentenced to terms of probation or a fine.[19] Thirty-seven percent of the 271 offenders sentenced under Justin's GSR and the 2K2.1 Guideline in the last five years received a downward departure and/or downward variance.[20] Thus, our request for both a below-guideline sentence and a sentence of time served with supervised release in this case is supported by the data.

In at least one other prosecution in this district involving the same charges, a former police officer, Adarbaad Karani, was convicted by a jury of two counts of making false statements during the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6), and one count of false statement in a record, in violation of 18 U.S.C. § 924(a)(1)(A).[21] *See United States v. Karani*, No. 1:17-cr-10107-RWZ, D.E. #116, Judgment (Dec. 27, 2018), *aff'd*, 984 F.3d 163 (1st Cir. 2021). Karani, a nine-year veteran with the Boston Police Department, made straw purchases for two civilians of two firearms, one of which was later stolen and recovered during the execution of search and arrest warrants for a "violent drug dealer and member of the Columbia Point Dawgs gang."[22] Karani was paid by the two

---

[18] *Id.*, *see* Note, indicating that results include offenders sentenced to imprisonment *and who received a commitment to the BOP.* Though the Commission tries to include time-served sentences, the process is laborious and imperfect as it requires a review of the Judgment and Commitment in each case to determine when and for how long an offender was in federal custody, and assigns a sentence, seemingly arbitrarily, of "one day" to those cases where such information is missing or difficult to discern.
[19] *Id.*, at "Sentence Type for Offenders in Selected Cell (after excluding § 5K1.1)."
[20] *Id.*, at "Sentence Imposed Relative to the Guideline Range for Offenders in Selected Cell."
[21] Karani was acquitted of a third count of false statements in a record.
[22] *See United States v. Karani*, No. 1:17-cr-10107-RWZ, D.E. # 112, Gov't Sentencing Memo, at 2 (Dec. 13, 2018).

civilians to purchase and transfer the firearms. *See Karani*, 984 F.3d at 169. Central to the government's sentencing arguments in Karani's case were the fact that he had abused his position as a police officer to secure a firearm for a "firearms novice [who] improperly stored the gun in his car's glove compartment, in violation of Massachusetts state law" and that his own text messages revealed his willingness to make other straw purchases notwithstanding his knowledge that "transferring firearms to individuals who lack familiarity with firearms poses a risk to public safety."[23] Karani, testifying at trial, insisted that he made the firearms purchases to obtain "discounted price[s] for" friends. *Karani*, 984 F.3d at 169. In sentencing Karani to concurrent 3-month terms of imprisonment, the court calculated the advisory guideline sentencing range at between 15-21 months and noted that he had "paid dearly for the offense and [was] very remorseful."[24]

Justin's case is readily distinguished from Karani, though his remorse and the weight of his loss is no less great. Though Justin's PSR references his apparent willingness to purchase a Glock for a police academy classmate, in interviews with agents, Justin expressed his understanding that all of his academy classmates – as well as Angel – were already duly licensed firearms owners.[25] He also neither requested nor accepted payment for the Glock firearm purchased for Angel, and he did not make or actually attempt to make a straw purchase for anyone else. Unlike Karani, Justin readily admitted wrongdoing and accepted responsibility by pleading guilty. Like Karani, however, Justin has suffered significant professional and personal losses, and a sentence of imprisonment would unjustly exacerbate those losses.

---

[23] *Id.* at 2-3.
[24] *Karani*, No. 1:17-cr-10107-RWZ, D.E. # 117, Statement of Reasons, at 1, 4 (Dec. 27, 2018).
[25] *See* Transcript, at D.E. # 86-2, pg. 13-14 (WATSON_00000651-2). This is not to say, of course, that such purchases on others' behalf would have been lawful, but rather that the same public safety concerns at issue in *Karani* are not present here.

12

## CONCLUSION

For the foregoing reasons, the Court should impose the proposed sentence of time served followed by one year of supervised release

>Respectfully submitted,
>JUSTIN WATSON
>By His Attorneys
>
>*/s/ Sandra Gant*
>Sandra Gant
>BBO #: 680122
>Stellio Sinnis
>BBO #: 560140
>Federal Defender Office
>51 Sleeper Street, Fifth Floor
>Boston, MA 02210
>Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 25, 2022.

>*/s/ Sandra Gant*
>Sandra Gant